## Quinn, Admrx., Appellant, *v.* American Range Lines, Inc., et al.

Argued December 2, 1941. Before Schaffer, C. J.; Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*Abraham E. Freedman,* of *Freedman & Goldstein,* for appellant.

*J. Harry LaBrum,* of *Conlen, LaBrum & Beechwood,*
*Robert G. Kelly* and *James S. Benn, Jr.,* for appellees,
were not heard.

OPINION BY MR. JUSTICE LINN, January 5, 1942:

Plaintiff appeals from judgment on a verdict for defendants in an action brought as administratrix of her deceased husband to recover, pursuant to the Jones Act,[1] for his death while in the employ of the defendants, as a fireman, on their vessel "Colabee." He was killed by a fellow employee, named Mansfield, also a fireman. Only one witness described the act. Defendants offered no testimony and moved for a directed verdict; the motion was refused; the jury found for defendants. As we think the evidence was insufficient to be submitted to the jury, we need not consider the assignments of error complaining of the charge to the jury.

The statute makes negligence the basis of liability; the burden of showing negligence was on plaintiff. The ship was docked in the harbor of Salem, Mass., where her cargo of coal was discharged. Parrish, the witness to the occurrence, testified that he was watchman on duty on

---

[1] March 4, 1915, c. 153, sec. 20, 30 Stat. 1185; June 5, 1920, c. 250, sec. 33, 41 Stat. 1007, 46 USCA sec. 688. "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employes shall apply; and in the case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. . . ."

Section 1 of the Federal Employers' Liability Act provides: "Every common carrier, by railroad while engaging in [interstate] commerce . . . , shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employes of such carrier . . ." [35 Stat. 65, 45 USCA section 51].

the night of December 23, 1938, and the early morning of the 24th. Quinn, plaintiff's husband, together with Mansfield, and a third man, employed as a wiper, had been on shore and returned together shortly after midnight in a taxicab. While the wiper was paying the taxicab driver, Quinn and Mansfield went on board; both were drunk, though able to climb the ladder at the ship's side; they were "arguing in more or less a loud tone."[2] When Parrish told them not to waken the sleeping crew, they went in the mess room.[3] The third man, the wiper, also went into that room. There Parrish again "told them to keep quiet, and then I [Parrish] sat down and had a cup of coffee, and they were arguing back and forth over 50 cents for beer, or some slight argument, and Quinn pushed Mansfield a couple of times, and came and sat down next to me. Q. What were you doing in there? A. I was having a cup of coffee. Q. About how long were you in there? A. I don't know, I imagine five or ten minutes all told. . . . Q. Where was Mansfield then? A. He was sitting at a table, I imagine about 10 or 15 feet away from us sulking. He wasn't saying much, he wasn't doing much. He was eating a sandwich at the time. Q. What happened after Quinn sat down alongside of you? A. It was just a very short time and Mansfield got up and walked by the buffet. Nobody noticed him pick up a knife. It was just a matter of a few seconds, and he held a knife over Quinn's head. Q. You mean he came back toward Quinn? A. Yes, he did, and he had a knife over Quinn's head. I jumped up and grabbed his wrist, and the wiper grabbed him from behind, and we parted them. It was all so tense, we stood there. Q. After you parted them, what did they do? A.

[2] "Q. Did they appear angry at each other? A. It was just more or less a drunken argument. It didn't seem anything at all at the time."

[3] This room is not well described. It seems to have been a room where "night lunch," bread, butter and cold meat was left such as it was "customary to leave . . . for the men when the ship is in port."

We were so tense we stood there. Q. Did you let go of him? A. Yes, we let go of him. Q. Both of you? A. Yes. Q. Then what happened? A. Quinn said something, and Mansfield pulled the knife so fast that none of us could stop him. Quinn looked down at his stomach and said, 'You stuck me,' and just dropped, I ran out and got the mate to tell him what was going on." He also said: "Q. You seized Mansfield's wrists and the wiper grabbed Mansfield from behind, is that correct? A. Yes. Q. And the wiper pulled him away from where Quinn was sitting? A. Yes. Q. And then what happened? A. Quinn stood up and it was all so tense, we just stood there afraid to move, more or less, and Quinn said something, and Mansfield brought the knife so fast that we couldn't even stop him. In fact, I didn't even see it. Q. At that time you had let go of Mansfield's wrists? A. Yes, we had all let go; the wiper had left go, too." The knife was the one used for cutting bread and had been "left on the buffet so the men could cut the bread for the night lunch."

Plaintiff's statement of claim avers negligence in a number of respects but there is no proof of want of that measure of care required of defendants in the circumstances. It was not like an assault on one workman by a foreman trying to hurry him in his work; that is, doing something in the master's interest: compare *Jamison v. Encarnacion*, 281 U. S. 635. Asked whether he had observed "any trouble between these men at any time before this night," the witness replied, "No, they seemed to be more or less buddies; they went ashore together, and they came on together, and they more or less hung around with each other." There was nothing, between the time the men came on board and the time Mansfield seized the bread knife, to suggest to the watchman that he ought to lock up the two men or awaken his superior officers to take charge of them. We regard what happened as something not to be foreseen in the ordinary course of events. It is, of course, very unfortunate that

the wiper and the watchman, when both seized Mansfield, were unable to hold him and prevent his using the knife; but, in the circumstances, that fact will not support a finding of defendants' negligence. Appellant also suggests that defendants employed an incompetent or inadequately instructed watchman, knowing him to be so; the evidence does not show either fact. The death resulted from a fight between the two men originating in purely personal motives; the doctrine of respondeat superior is therefore not applicable: compare *Davis v. Green,* 260 U. S. 349; *Fowler v. American Mail Line* (9th Cir.), 69 F. (2d) 905; *Yukes v. Globe S/S Corp.* (6th Cir.), 107 F. (2d) 888; *Bonsalem v. Byron S/S Co.* (2d Cir.), 50 F. (2d) 114; *Meyer v. Dollar S/S Line* (9th Cir.), 49 F. (2d) 1002; *Lortie v. American-Hawaiian S/S Co.,* 78 F. (2d) 819.

As we hold the evidence insufficient, we should refer to the rejection of proposed evidence. The first assignment is to the exclusion of evidence apparently offered as expert testimony by appellant's counsel. "I offer to prove that this man, this witness [not employed by defendants], has held a Chief Mate's license since 1933, and I want to ask him what the duties are of a night watchman, and what they cover. . . . I do not want him to express a legal opinion, but I want him to tell what the general practice is as to what is required of a night watchman, and what he is expected to do in certain circumstances." The offer was rightly rejected for several obvious reasons, among them, one considered in *McGeehan v. Hughes,* 223 Pa. 524, 72 A. 856, and another in *Delair v. McAdoo,* 324 Pa. 392, 397, 188 A. 181.

The second assignment complains that an objection was sustained to questions asking Parrish when he signed articles and whether defendants asked him about his previous service. There is nothing in the record to show that plaintiff was injured by the ruling.

Judgment affirmed.